Mr. Marshall, please call the first case of the morning. Yes, sir. Your Honor, this case on the doctor. Pursuant to statute 17-0324, the people of the state of Illinois, plaintiff's appellant, be John M. Ruffin, defendant's attorney. Honorable on behalf of the plaintiff's appellant, Ms. Bethany Lee. Honorable on behalf of the defendant's attorney, Mr. Stephen Paul. Thank you. Ms. Lee, on behalf of the appellant, you may proceed. Thank you. Good morning, Your Honor. Counsel. May it please the court. We are here today asking this court to reverse Judge White's order of April 26, 2017, which granted the defendant a new trial as to all of his pending convictions. The key issue before the court and was before the trial court was whether or not that Oval County police report that involved Chris Cummings, which was one of the victims of the aggravated battery with the firearm, would have changed the result. In other words, was it legally material? All right. So you're not, as a threshold question, you're not contesting that the report was never turned over. Correct. That's not an issue. Correct. You're alleging that if it was not, it did not prejudice the defendant, in essence. That it would not. It was not material, so it wasn't prejudiced. It wasn't really material, correct. Because we don't know whether it was inadvertent or willful. It really doesn't matter. It was not turned over, so we understand that. But, however, we do not believe that it was legally material, that there was a reasonable probability that the outcome would have been different. What's our standard of review? It varies depending on the different issues. I do believe that the court articulated but did not actually apply the correct standard. What is the standard you believe the correct standard that applies to this review? Well, that should be de novo review for that issue of whether or not legally the judge applied the correct standard. To the extent that the judge may have made some factual findings, or I don't believe he made any credibility findings, maybe some factual findings, that would be manifest weight. So if he did not apply the incorrect standard and you get to the actual merits of whether or not this would have changed the result, then you could look at it as a manifest weight. That's a pretty high standard, isn't it? Isn't that a pretty deferential standard to the trial court? It is, but I think in this case, for one thing, especially because the judge kept saying it was whether there was a possibility that it would change the result, it's pretty clear that he wasn't looking whether there was a reasonable probability. But even if you look under the deferential standard, the court said he wasn't going to consider any of the trial evidence. He was only looking at the fact that this wasn't turned over. He never exactly said that it would have changed the result. The defendant's own prior counsel said, we don't know if we would have even used this. Let's put it in the context of what actually happened here. The defense in this case was self-defense, was it not? Correct. But it was self-defense in the sense that the defendant said he was afraid that Brad was going to take his gun, not Chris. So if he was afraid of Brad, then that doesn't – this report, which actually even the defendant's own counsel said makes Brad look in a positive light, would actually not help the defendant. It would hurt the defendant because – and his counsel admitted that that might be a good reason not to use it. Because you're saying under the facts of the case, the defendant – there was no evidence that he was the aggressor in this instance? There was – that who? That Chris was the aggressor? The defendant in this case. Oh, no, there was definite evidence that the defendant was the aggressor. Not the defendant, I mean Cummings. I don't see evidence in this record that Chris Cummings was the aggressor in this incident. There was – first of all, it's undisputed. Weren't they – didn't the three of them approach the defendant at some point during this incident? Let's put it that way. There are very differing reports. The initial verbal altercation did not involve Chris Cummings. I believe it involved Thomas Hanna and either Mike Bella or Mike Cummings. No, it was Mike Bella. Mike Bella, I'm sorry. That was the initial verbal dispute between the defendant and those characters or those people. Then the defendant had grabbed Jamie, which upset them later. You know, they came back, and it was only Heather Dresser who touched the defendant. Nobody else touched the defendant. He pushed her. But the defendant was by himself. He was single, right? Yes, he was by himself. There were four or five other people. He didn't actually reside at this location, so I'm not really sure he needed to be there if he was so terrified of these people. But the fact of the matter is he was not aware of the Cummings-Ogle County report at the time of the incident. So you can't say it changed his mindset because he knew about it. He didn't know about it. He was not aware. That's not really necessarily relevant, correct? I mean, we're talking about self-defense. Prior to violent acts by another person, the defendant doesn't have to know of those acts. Well, if he knew about it, he could have said it changed his mindset in terms of why he was more scared. He's the only one that brought a gun to this incident. Nobody else did. Nobody has him, him being Chris Cummings, moving toward the defendant after the defendant punches or slaps this girl, correct? There is one witness who indicated that Cummings, Chris Cummings, was one of the people. It was Emma Zola who said seven to eight people went toward the defendant. Yeah, and then I think one of the other witnesses, there is some discrepancy in terms, because it didn't all happen very fast, obviously. There are several people who say that it was Plaza, Hannah, and Michael, I think it was Cummings, who went toward the defendant. Correct. And in that sense, obviously, Cummings wasn't an aggressor, if that's the case. But either way, it was really Brad that was up close. And the report, as the defendant's own former counsel had said, makes Brad look good. So you actually would have put Brad in a positive light. Maybe he was trying to diffuse the situation. It would have impacted more positively on Brad. But we have two different charges. Okay, it might have reflected positively on Brad, but the person that it might not have reflected positively on would be Chris Cummings. Correct. Because he was convicted of that particular battery, correct? Correct. But he was not convicted. It was a supervision. It was a supervision. It was two years prior. It involved fists and kicking. It did not involve any guns. Again, I do respectfully think it's relevant that the defendant didn't know about it, so we can't say that it changed his mindset at this particular time. But I don't see it as similar in the sense, again, it was fists and punching and kicking, not guns. And, again, even in this incident, the defendant was the only one who had a gun. And the defendant said, well, I was scared he was going to take my gun. Well, he shouldn't have had that gun in the first place, and there wouldn't have been an issue. What is your understanding of the holding of the People v. Lynch case, the Supreme Court case that got into this area? What is your understanding of this? I do think that when a defendant raises self-defense, it is admissible to show that one of the victims of the ‑‑ that the victim was a violent ‑‑ Had a propensity for violence, right. Correct. So that would have been as to Chris. Yes. So you still have three. But the other thing in this situation, Chris was shot in the back. He was running away. So the defendant shot him in the back. The defendant also actually shot Mike Fella in the back, too, and then he also shot Brad initially up front. But even then, Brad was obviously trying to turn and go away because he was shot twice in the back as well. Do you believe that this evidence would have been admissible at the trial? The Oval County Police Report in and of itself would not be admissible. I know. Let's assume that they found witnesses through that report that could testify to what actually happened during that incident. I do think that the ‑‑ well, now Justice Zinoff, who was the trial judge at the time, would have admitted it if it was offered. The problem is you have defendant's attorney saying we don't think we would necessarily have offered this. So if it was offered at all, I mean, if it wasn't offered, it certainly couldn't change the result because it's not even offered. Well, the defense attorney, the second defense attorney who was the judge at the time said, look, I would have investigated it. Sure. But he didn't know one way or the other for several reasons whether it would have even been offered. Right. But shouldn't he have had the opportunity to investigate it on behalf of the defendant? Right. But that's not the end of the analysis for Brady because, yes, we understand it might have been admissible at trial if it was offered. However, the key factor is now on this third stage postconviction where it's actually the defendant's burden to prove that it would have ‑‑ it would have been reasonably likely to have changed the outcome. And I don't think that the evidence in this record supports that, the defendant having proven that. So in essence, are you saying that even if the evidence of Cummings' commission of the 1997 battery was admissible, that would not have had any bearing on Plazza's propensity toward violence? Absolutely. And, in fact, may have made him look in a more positive light, which would have made it tougher on the defense. Because they actually reduced from first degree murder to second degree, finding that maybe the defendant had some kind of a fear here. But in no way are you ever going to get to the point where you find it to be reasonable. Nobody touched him. Nobody had a gun. What evidence was there of any that Cummings was aggressive on the incident that led to him being shot? There was one witness that I'm trying to find. I do acknowledge that there was one witness that said that he was approaching, took a few steps forward towards him. He certainly wasn't in close range, close enough to be shot while he was running away. But he was not ‑‑ the evidence doesn't really support him being the aggressor in that sense. And the problem is that with defendants that said I was afraid of Brad, that he was going to grab my gun. So he was closer. Maybe that's why. But the bottom line is, whoever ‑‑ let's take the gun out of the situation, although we can't ultimately. You have the defendant and you have at least three and possibly seven people there who may or may not be approaching him, but certainly are there and there is a verbal confrontation. So it's one against seven. Right. But the one person was provocative throughout the entire night. He was grabbing at Jamie Henderson even after she went around behind her boyfriend and hid. And he's still grabbing at her. He grabbed a beer when he wasn't supposed to from somebody. He didn't need to be there, to be honest. He came. He didn't live there. He wasn't friends with these people. He's the only one that brought a gun looking for trouble. Or he brought a gun looking for protection. Well, the protection would have been not going there in the first place. I mean, he didn't need to be there. He could have left. If he was that afraid or that scared, he could have left. And he certainly didn't need to agitate the people that were there. But the other thing is, Chris Cummings was otherwise impeached. So you're not actually adding that much other impeachment evidence. He already was impeached with a conviction for, I think it was robbery, I believe, as well as his DUI that he had just pled guilty to, his narcotic use. I mean, those things all came out. It also came out that he had two prior altercations with this defendant, correct? It came out from defendant's testimony, correct. Didn't Cummings testify to that also? That he had had at the apartment two weeks before. Right. Correct. You argued earlier that the trial judge applied an inappropriate standard. I mean, you would concede, though, that the trial judge at times did enunciate the proper standard. Articulated, yes. Respectfully, I really do not believe he applied that in the sense that on page, it was page 2757 to 58 of the record, he said, the issue here is to determine if there was a possibility the jury would have found the defendant not guilty because of self-defense. It's not a possibility. But at 2886, he said, you know, if there's a reasonable probability that the evidence had been disclosed to the defense, the results would have been different. At 2888, he said basically the same thing. So, I mean, we have conflicting. Right. But when you really look at, I mean, he said, I'm not even going to look at what the jurors would have done because that's not for me to decide. That's implying that he is not making any kind of decision of whether the result would have been different, which is really what the issue was at this point in time. Well, can we affirm on any basis in the record? Sure. If the court uses the wrong legal reasoning, if we believe the result was correct, we could affirm on that basis, could we not? Correct. Or you could reverse and you could modify as well. You can modify and find that it only affected one of the three convictions, which is our alternative position. And that would be Cummings' conviction? Correct. And again, he was shot in the back of the leg running away. So I don't see that it would impact that. But it certainly would have no impact on Brad Fiza or Michael because it doesn't show them as the grasshoppers. Thank you. Anything you want to say further to wrap up? I can wait until we're done unless anybody had any questions. All right. Thank you very much. Thank you. All right. Next, Mr. Hall on behalf of the appellant. Good morning, Your Honors. Good morning. May it please the Court. Counsel. Your Honors, we would ask this Court to affirm the decision of the trial court for a number of reasons. But I think what needs to be addressed first is kind of the general glossing over of the facts that were included in that 1997 Bogle County report. Because although it was but one report, it is a six-page report, single-spaced, with an enormous amount of information in it. And that was something that was noted by Judge Famiglia during the third stage hearing. In fact, he stated in the record that it's a very complex document and a very important document. Judge Famiglia? Judge Famiglia, during the third stage hearing, when he testified as having been Mr. Ruffin's counsel at trial, he stated it's a very important document. Separately, he stated it's a very complex document. He didn't say he didn't know whether he'd use it or not. He did say that. Is it material? I mean, you would agree that this thing cuts both ways. I mean, Plaza's the person who's murdered. Your client's on trial for a number of offenses, but he's on trial, first and foremost, for murder. And Plaza is the peacekeeper in this report. Correct. And I would agree that it does cut both ways. And so I think Judge Famiglia at the time answered like a trial attorney. You know, he recognized there are bad facts and there are good facts in that, but what he did say further was that he would have investigated. He would have sent a defense team out. You know, to his detriment, he had only seen, and when I say he, I mean Judge Famiglia, he'd only seen that report for the first time about an hour to an hour and a half before he testified. As he noted in his testimony, he reviewed it in the state's attorney's office over the noon hour. The record shows that he was the first witness to testify that afternoon. But having reviewed it, I mean, you don't have any disagreement with, I mean, he only had a short time, but his testimony was pretty spot on, wasn't it, as far as what he thought about that report? Yes, yes. I think, again, he was very candid. He said this cuts horribly for Chris Cummings and it makes Brad Plaza look good. He also stated that there were ways to make that not hurt Mr. Ruffin, but that would be something they would have to evaluate over time. But, of course, he, being Judge Famiglia, is not the one that decides whether this was a Brady violation. He's not the one that's held to the standard of having to say, yes, I believe that this would have. No, no, but we're getting to the issue of materiality, and that's really one of the major issues here. Right. Not the major issue is whether it's material. I guess I'm just struggling with is something material in that it would probably change the outcome of a trial. I mean, that's a pretty high burden. If it cuts both ways and an attorney's looking at it going, I'd investigate, but I'm not even sure I'd use it. So then we reverse, the trial judge reverses this. They have a whole new trial, and then the next trial attorney decides it does cut both ways, and I'm not going to risk this, that it's going to shed favorable light on Plaza. And so we have a whole new trial for nothing, and it's not even used? Well, I can certainly understand that concern. I would point the court to People v. Beeman, which we cited. And in that case, as you know, there was the suppression of a John Doe that was a possible suspect in that case. And the defense had asked for the disclosure of any suspects in that case. They received a list of three on that, and it was not John Doe. And they didn't have any firm evidence that there was another John Doe that might have been a possible suspect. The state moved to eliminate, to bar the defense from discussing at any point the fact that there may be another suspect out there, and that it's not the defendant. And further stated that they did not have any evidence that was, you know, more than speculative about there being other suspects. As the post-conviction petition progressed, we find out at the third stage that it was, in fact, a John Doe. We find out that an officer had interviewed him. He was nervous, gave inconsistent statements, failed to polygraph because he couldn't follow instructions, and they thought that was purposeful. But I think the most important part of that was that the trial counsel for the defendant testified at the third stage hearing, and he testified that he would have surely attempted to use that information. He didn't say, I absolutely would have used that information. 100% I would have used that information and it would have made a difference. He said he would have attempted to. And, again, I think that's an honest and candid answer for a trial attorney. Let me ask you a pointed question. Assuming that the evidence of the 1997 incident involving Cummings showed Cummings' propensity for violence, taking that point and going forward, how does that import Cummings' conviction of a battery or commission of a battery in 1997, how does that have any bearing on Plaza's propensity for violence or lack thereof? What does that have to do with Plaza? Your Honor, we would submit ñ well, actually, we would agree with the State this all happened in seconds. As Your Honors know from reviewing cases and being judges before, these sort of shootings don't happen in the course of minutes. It's not a thought-out thing. So the idea that we could separate out the shooting of Plaza from Cummings from Vela I think is false. What the report tells us is that Cummings had a history of violence, but more specifically that he instigated others to violence. In that report, the 1997 report, he got other people to beat up Mr. Kiko. It was the first time Mr. Kiko had met them. He encouraged others to beat him up. They put a cigarette out on his face. They punched him, kicked him. He got up and ran away. They chased him down, beat him up again. He got up and ran away. They chased him down. And while others are yelling, throw him in the fire, according to the report, they beat him up a third time. Was this anything to do with Plaza? Yes. At that third ñ sorry, yes, Your Honor. At that third time they were beating him up, that's when Mr. Plaza stepped in and pulled him off. And that's not to say that Mr. Plaza didn't do a good thing or wasn't admirable in pulling those folks off Mr. Kiko. It's just to say that Mr. Cummings, in that scenario, whether in 97 or we submit in 1999, was instigating others to violence. He was getting others to help him achieve his goals, and that happened in 1999. That series of events happened in a matter of seconds. So why does he shoot Plaza first, under your theory? Plaza is the peacemaker. Even if we followed your argument that Cummings incites other peoples, he shoots Plaza first, correct? Correct. Because Plaza is the closest to him, as was stated in, I believe, the state's brief underlying this appeal. I think it was their motion to dismiss, and also during the testimony at the third stage hearing. One of, I believe it was Mr. Hanna or Sabella, was approaching from the right. Another person was approaching from the left, and Mr. Plaza was coming after Mr. Ruffin straight down the center. And as the biggest person, I believe the testimony at trial was that he had kind of bent down almost as if to tackle like a football player, which is why he was shot first, because he was closest. But I believe all the other testimony confirmed that the other people that were chasing him and flanking Mr. Ruffin were within feet, mere feet, three to four feet of him. We already have evidence. I mean, we weigh this Cummings report against all the evidence, correct? Sure. We had evidence in the record that people were approaching him aggressively. And it allowed for a self-defense instruction. It allowed the defense to argue at trial that he feared for his life, because all these people were approaching him aggressively. I think it was Mazola testified seven to eight people were approaching him aggressively after he hit the dresser woman. I mean, this is all in the record already. I'm just wondering, how does this Cummings report embellish on that, that we already know this evidence? We already have the evidence in the record. It's in the record. I mean, there's already evidence in the record of people approaching him aggressively. How does this add to it that this guy was aggressive in the past when we already have evidence of people approaching the defendant aggressively? Well, because there was contradictory testimony between Mr. Ruffin and Mr. Cummings as to those prior encounters that were just discussed with the state. And, of course, Mr. Cummings' testimony was to the effect of, you know, Mr. Ruffin kept coming up and harassing me and aggravating me and trying to start fights. Mr. Ruffin's testimony was the opposite of that. And so those points were used in an effort to get certain jury instructions at the jury conference with Judge Zinoff, now Justice Zinoff. The way I think that this report would have changed that is that it would have not only impeached the credibility of Mr. Cummings as to his statements regarding prior incidents. It would also show him to possibly be a liar in that the officers that investigated that case believed Mr. Cummings was lying. It would show that he has not just this one instance of potentially being involved in violence, but really a very serious violent action where he incited others to violence. So it would bolster the idea that he is a violent person and may be the initial aggressor in this case. It would also impeach his credibility. And it would support the idea that maybe Mr. Ruffin's testimony should be given more weight than Mr. Cummings. Wasn't Mr. Cummings impeached by other evidence in the trial? Sure. I believe he was impeached by a burglary conviction in 1996 and possibly also a DUI. But I would submit to the Court that those are far cry from a battery in this specific circumstance. And that's really what I believe is important is the specific circumstances of that battery that were suppressed. He was also impeached with the prior incidents with the defendant. He was impeached as a drug addict. He was impeached as an alcoholic, correct? Yes, Your Honor. So, I mean, there's a lot of impeachment there in Cummings. I would agree that there is a significant amount of impeachment. Again, I would stand on the argument that it doesn't have the same weight that it would if he was confronted with this 1997 beating of Mr. Kehoe. And I would like to briefly state, you know, there is some argument from the State in the briefs that it was just speculation as to whether we, the defense, would have been able to track down witnesses that could, you know, testify in live court. Because, again, the report we acknowledge would not have been admitted as substantive evidence. And we know that at least two, Mr. Cummings and Mr. Jeremy Cook, were involved in both incidents. And Mr. Cook was disclosed as a possible witness in the 1999 case by the State in their August 26, 1999 disclosure. So, we know for a fact that there were at least two people involved, seriously involved in both incidents that could have been tracked down and could have been interviewed or just called as witnesses. And that's fairly serious. I'm sorry. Ms. Poit makes a point to say that she doesn't even know why the defendant was there because you know many people that didn't live around there. I mean, what does that have to do with this particular issue? He was there. He apparently knew somebody, Ms. Dresser, because she approached him first, smacked him, and he hit her back. Sure. So, I mean, what does his presence with a gun have to do with this particular problem? Well, so I think I would have to parse those questions. To answer the issue of why is he there, why not? You know, I can't speculate as to why he was there. I think the underlying testimony at trial was that he had met up with someone that he knew from that apartment complex or maybe it was his own apartment complex. I can't remember specifically. And they had walked to a gas station to get a beer and were walking back when they encountered the Cummings and Mazzola and everyone else. So, that's why he was there is the best of my recollection of the record. Why was he there with a gun? Well, that was an issue for one of the claims we brought up on the Third Amendment post-conviction petition, which was that he had been shot, not of his own doing and not related to gangs, but in 1995 in the streets of Chicago. And so he carried a gun for protection as part of that underlying record. Let me ask you a point of question. Is your argument an all-or-nothing proposition in the sense that all convictions should be reversed and remanded or should the convictions involving Cummings because of his propensity that didn't come out as you've alleged should be reversed and remanded? Is there a way to do that or is it an all-or-nothing proposition? I believe ours is an all-or-nothing proposition. And when I say I believe, I mean ours is an all-or-nothing proposition. And I don't think I answered your question earlier as specifically as I wanted to. In this case, I don't think that we can parse out what happened and how it happened because it happened so quickly. So once people started chasing Mr. Ruffin and once he pulled out a gun and started shooting, it was over in a matter of seconds. So the idea that we could say, well, you know, Mr. Cummings, who has this history of violence and specifically inciting others to violence, is somehow going to have, you know, that conviction vacated as to him, but the others stand, I don't think is a possibility in this case. Not only because we don't have any support in the law for it. It's an issue of first impression, but also because I think the latest… What is the issue of first impression? Whether a court can do that? Whether we can parse the relief on the, you know, vacating convictions on a post-conviction matter. But also because, you know, again, once you introduce that prior history of violence, the fact that he incites others to violence, and that essentially is what happened in this case, I don't think you can separate those three different convictions because they happened over a course of only seconds and they were all part and parcel of the same event. Maybe that's an answer to this question, but in weighing all these facts, how do we weigh the fact that Plaza is shot twice in the back, Bella is shot while fleeing in the back of the leg, probably most importantly to the post-conviction petition, Cummings is shot in the back of the leg while fleeing, and then, and all this happens, as you argued, in a matter of seconds, but then not in a matter of seconds are the defendant's actions after that showing consciousness of guilt. Stealing the car from a woman at gunpoint, getting involved in a high-speed chase, pulling the gun according to the officer's testimony on the deputy. I mean, doesn't that all factor into this, too, as to whether or not this one report, and if you put in one prior incident of Cummings' violence, would change the outcome, probably change the outcome of the trial? I think the initial facts you discussed, the shooting in the back, the shooting in the legs, supports Mr. Ruffin's testimony at trial, which was that he began firing the gun. He was afraid, started firing the gun, and he actually specifically testified  be supported by the idea that two of the individuals were shot in the leg. As to being in the back of the leg, how long does it take to see the muzzle flash and make a quick turn? I can't say in that instance, but that would be our argument. With regard to Mr. Plaza, I believe the estimate, or the testimony from Dr. Bloom, who was the pathologist on the case, was such that he was shot, at least initially, with the bullets entering in the upper part of his body, exiting, I believe, through the lower part of his back, again, indicating that he was leaning down. And it seems that after the first couple of shots, he may have turned to try and escape that. In terms of how does that affect the overall case, I'd like to answer your question. If you could repeat that second part. Yeah, how do we factor in the evidence of consciousness of guilt based upon his actions after that and stealing the car and getting involved in the chase and all that? Sure. I think he definitely demonstrated some consciousness of guilt, although I would probably phrase it as fear that he knew that he had just shot people and was afraid and probably took an immature and incorrect and inappropriate approach to handling that fear and the consequences that he knew he would have to face. But certainly within the law and state of Illinois, that is consciousness of guilt, and I can't reconcile that. All right. Thank you very much, Mr. Hall. Thank you. All right, Ms. Lee, you may address the court in a final summation. The defendant said that he was afraid of Brad. It was his burden to prove that somehow this Cummings report would have changed the outcome. It did not in any way make Brad look like an aggressor. The other thing is even if you have these people chasing after, and there is some discrepancy in how many, it might have only been three, defendant is the one that turned and used deadly force, which would not be justified, especially once the victims have turned and are running away. As to Brad, the coroner actually said that the shots in the back were what had caused the death, and the shot in the neck had contributed to it. So the defendant shot. Everybody is running away. He keeps shooting. At that point, you have to withdraw at some point. They're not attacking you at that point. They are running away, and he's continuing to shoot them. Again, it was his burden, because we were now at the third stage of the post-conviction, to prove that it would have likely changed this result. And the facts and the evidence that he put forward, from his own attorney, I would look at this. I would investigate this. I would see if I could offer it. I initially would have some hesitation because it could cause a mini-trial, and it could distract the jury, and it could do all these other things. So the question is, did defendant prove that this would have changed the result? No, because what the defendant showed was that What is the standard? To prove it would change the result or likely to change the result? What is the standard? I'm sorry. It was a reasonable likelihood that it would change the result. I apologize if I was misarticulating that. But a reasonable probability that the outcome would have been different. And I do think absolutely the three can be severed. I realize that because they're all shootings, it still seems a little intuitively as if they're very similar and all the same things. But what if it was, say, an attempted murder or a second-degree murder and a possession of a controlled substance? Very clearly tried together, and yet the result would not change as to one versus the other. Well, but he – I mean, the defendant specifically says he is afraid of Brad, maybe because he's closest. But Mr. Cummings is the primary movement. He's the one convicted in the – as a result of the incident related in the report. So how are we – we don't know where Mr. Vela has been or was at any time. But how can we sever those or how can we take them separately? Well, I actually think that, in effect, proves the point, is that if the defendant was afraid of Brad, something that's going to make Chris look somehow more aggressive than he already did isn't going to show Brad as being more aggressive. So it's not relevant to that. But the defendant himself is saying, I'm afraid of A, but really the report relates to B. It's hard to take those apart. Right. I think is what – But the fact that he's afraid of A and it relates to B actually proves the point that he's – you know, it's defendant self-defense. Again, he didn't – he says, Brad was coming at me. I needed to defend myself. Making Chris look like more of an aggressor doesn't change the fact that the defendant says it was Brad I was scared of. So how does that change the result? Well, let's take a step back. If you see three or four people coming at you, one of them has a propensity for violence, how do you know what's going to happen? If he's in front of his life from one person of the group, would that be sufficient? Right. Well, he – again, that's where I think it is relevant that the defendant didn't know about this prior report. So the defendant – I mean, he knew about the other incidents, which all came out of trial. But he certainly didn't know about this 1997 supervision for battery. So he can't say, well, I was especially scared because I knew of that and that's why I felt I needed to use the self-defense. At best, it makes it more likely that in some way Chris is a violent person. But Chris wasn't the one that was right there. And there is no indication. Justice Burke pointed out very appropriately earlier, under Lynch, does the defendant have to know about the history of violence? Not to make it admissible, but if it's – can I – okay. Not to make it admissible, but in order to change the result, yes. It's two separate things. I think that if it was admissible, if it even came in and it gathers all the reasons in the world to think it would not have – Admissible versus materiality are two separate issues. If it – well, if it would be like – materiality is what – Right. You have to say it. It may be admissible, but it's not material. That's what you're arguing. Exactly. Correct. All right. Yes. Okay. Thank you. All right. Thank you, Ms. Hill. I'd like to thank both counsel for the quality of their arguments here this morning. The matter will, of course, be taken under advisement and review by the Court. A written decision will issue on the matter in due course. We will stand in recess to prepare for the next case. Thank you.